By the Review Panel : By S. Res. 277,91st Cong., 1st Sess. (1969), the United States Senate referred S. 202, 91st Congress, a bill “to provide that the United States disclaims any interest in a certain tract of land”, to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. §§ 1492 and 2509 (1970). The Chief Commissioner referred the case to Trial Commissioner Lloyd Fletcher for proceedings in accordance with the applicable rules, and designated the above-named members of the Review Panel to consider the trial commissioner’s opinion on the merits of the matter.
After joinder of issue, full trial was held in Albuquerque, New Mexico. Both parties there presented evidence. Requested findings of fact and briefs were subsequently submitted, and on September 16, 1971, Commissioner Fletcher filed an opinion, with accompanyingfindings of fact, in which he concluded that enactment by Congress of the bill providing for waiver and relinquishment of any claim of title to the land area in dispute by the United States is appropriate and would not constitute a mere gratuity.
Plaintiffs accepted Commissioner Fletcher’s report. Defendant excepted thereto, insisting that at the location in dispute the proper northern boundary of the old Spanish land grant in question is not the survey line fixed and established by United States Deputy Surveyor John H. Walker in 1905, and approved by the U.S. Surveyor General in 1909, prior to the issuance of a patent in 1911 to plaintiffs’ predecessors in interest, but the Rio Hondo. The matter is before the Review Panel on the written briefs of the parties, both having waived oral argument.
We concur specifically in the trial commissioner’s recom *1021 mendation as to plaintiffs’ equitable entitlement,[1] and, without adopting as our own each and every word in the opinion or inferring its applicability as a general precedent, we concur generally with respect to the net result of his conclusions. Careful study of each of the authorities cited and of the arguments for and against the conclusions reached by the trial commissioner, and diligent independent research, leave us entirely unpersuaded that a conclusion contrary to that reached by him would be justified.[2]
The basic inquiry here involved[3] is difficult and troublesome, and the answer given cannot fairly be said to be absolutely free from doubt. There is a vast diversity of legal precedents in the general area of boundaries, making the search for precision a most unrewarding task. Nevertheless, we believe that any doubts we have (or Trial Commissioner Fletcher may have had) have been resolved in a manner wholly consistent with the equitable purposes of the Congressional reference.
Accordingly, the Eeview Panel concludes that the relief recommended by the trial commissioner is just. This determination is hereby submitted to the Chief Commissioner for transmission to the United States Senate.
The opinion, and findings of fact, of Trial Commissioner Fletcher as modified by the Eeview Panel follow.
Opinion oe the Trial Commissioner
Fletcher, Commissioner: This action arises out of Senate Eesolution 277,91st Cong., 1st Sess., which relates to S. 202 of the same Congress entitled, “A bill to provide that the United States disclaims any interest in a certain tract of land.” The Eesolution provided that such bill be referred to the Chief Commissioner of the United States Court of Claims for bis report pursuant to 28 U.S.C. § 1492 and 28 U.S.C. § 2509.
*1022 The basic issue for determination is whether the northern boundary of an old Spanish land grant, as confirmed and patented, is a stream known as the Arroyo Hondo[1] or is a survey line fixed and established 'by United States Deputy Surveyor John H. Walker in 1905 prior to the issuance of a patent in 1911.
On August 9,1742, the Spanish land grant in question was created.[2] Many years later, in 1857, the heirs of the original grantees applied to the United States Surveyor General for confirmation of their grant. In 1861, the Surveyor General investigated the claims of these heirs and recommended to Congress that it confirm this grant. On March 3, 1869, Congress confirmed the grant. 15 StaJt 342.
Finally, in 1905, the United States had the Antoine Leroux Grant surveyed, as required by the confirming acts.[3] The survey was made by John H. Walker whose survey and field notes were adopted and approved by the United States Surveyor General in 1909. Between 1909 and 1911 the Interior Department endorsed the Walker survey line as the proper boundary of the Grant in the course of dismissing numerous protests of said line. In 1911, President Taft signed a United States patent approved by Congress for the Grant. This patent quitclaimed any interest of the United States in the surveyed Grant and incorporated by reference the survey and field notes made by Walker.
The difficult problem herein arises from the fact that in a number of pertinent documents the northern boundary of the Spanish Grant is referred to as the “Arroyo Hondo.” However, the survey line fixed and established by Walker for the northern 'boundary went both north and south of the river. In the area in dispute, the Walker survey line runs slightly north of the Arroyo Hondo. Both plaintiffs and defendant claim title to the 6.95-acre strip of land between the Arroyo Hondo and the Walker survey line.
The United States Government has refused to initiate or to submit to a suit to quiet title, and the doctrine of sovereign *1023 immunity would prevent plaintiffs from compelling defendant to submit to such a suit. Therefore, plaintiffs are without a legal remedy in their efforts to perfect their asserted titles and to secure the enjoyment of the subject property.
The lack of a legal remedy, of course, does not preclude relief by way of a congressional reference where the plaintiffs have a valid but unenforceable right. Plaintiffs contend that they have, at least, the requisite equitable claim to the land in dispute for the following reasons: First, the U.S. patent quitclaiming any interest in the Grant incorporates by reference the official Walker survey and field notes. Plaintiffs argue that such incorporation is conclusive as to the description of the property. Second, plaintiffs assert that since the patent was to be a final and binding settlement of all title questions between holders of the grant in question and defendant, the Walker survey line, even if inaccurate, controls the length and location of the boundaries of the Grant. Third, plaintiffs argue that defendant is estopped to say that the boundary is other than the Walker survey line because: (a) the boundary established by the deed whereby defendant acquired title to most of the Grant is the Walker survey line; (b) in the area in question, the United States Forest Service had boundary signs posted along the Walker survey line rather than along the Arroyo Hondo; (c) the Forest Service has maps and other documents which indicate that the Walker survey line rather than the Arroyo Hondo is the northern boundary of the Grant; (d) some Forest Service personnel informed plaintiffs that the Walker survey line rather than the Arroyo Hondo was the boundary of the Grant; and (e) the Forest Service, in areas where the Walker survey line is south rather than north of the Arroyo Hondo, claims such line is the boundary of the Grant. Finally, plaintiffs urge that at least the cabin site of two of the plaintiffs is within the Grant even if the Arroyo Hondo rather than the Walker survey line is controlling because the river has been moved artificially southward at that location.
Defendant contends that plaintiffs have no legal or equitable claims to the land in dispute because the 1911 patent de *1024 scribed the northern boundary of the grant in question as follows:
* * * on the north by the Arroyo Hondo.
Defendant asserts that since a reference to a natural monument controls over reference to courses and distances, the Arroyo Hondo rather than the Walker survey line is the controlling northern boundary of the Grant. Defendant argues that the survey line run by Walker was intended to be a meander line and that meander lines are not boundary lines, and, in any event, that Walker did not run the purported meander line properly. Defendant urges that plaintiffs had notice of the United States claim to the subject property when they took their deeds, and, therefore, there can be no detrimental reliance on their part as to the location of the boundary in question. Accordingly, defendant asserts that the doctrine of estoppel is inapplicable to the present case. Defendant also contends there is no persuasive evidence that the Arroyo Hondo has ever changed its location.
It is well settled that boundaries of lands recited in a patent, even if incorrect, are conclusive upon the United States and the patentees and their successors because the patent is intended to quiet title to and secure the enjoyment of the land for the patentees and their successors. Dominguez De Guyer v. Banning, 167 U.S. 723, 743-4 (1897) ; City of Los Angeles v. San Pedro, L.A. & S.L. R. Co., 182 Cal. 652, 189 P. 449 (1920). It is also well settled that a survey, even if incorrect, which is incorporated in a patent becomes a part of the patent and is conclusive despite contrary or conflicting descriptions also incorporated in the patent. See, Dominguez De Guyer v. Banning, supra, at 743. Therefore, the description incorporated in the 1911 patent is the starting point in the resolution of the conflicting claims herein.
The patent in question incorporates the following description of the northern boundary of the subject property:
On the north by the Arroyo Hondo.
This patent also incorporates by reference the plat of survey prepared by Walker together with his field notes. This survey was used to diminish the lands conveyed under the original Spanish grant by 3,655.98 acres (60,085.29 acres *1025 minus 56,428.31 acres). Thus, the Walker survey courses and distances were used to modify the natural objects incorporated as boundary markers, and the survey line and plat become an artificial monument. Ordinarily, natural objects control over courses and distances with respect to boundaries because the former are thought more permanently reliable and less susceptible to error. See, Oklahoma v. Texas, 268 U.S. 252, 255 ( 1925); United States v. State Investment Co., 264 U.S. 206, 211 (1924) ; and Cordova v. Town of Atrisco, 53 N.M. 76, 201 P. 2d 996, 999 (1949). However, where the United States issued patents confirming Spanish land grants, as herein, a survey of the land was required prior to issuance of a patent and the survey was considered controlling over the broad, vague descriptions referring in general terms to natural objects. Dominguez De Guyer v. Banning, supra, at 743; United States v. State Investment Co., supra, at 212. Thus, in the present case, repeated mention of the Arroyo Hondo as the northern boundary is not necessarily controlling over the Walker survey. Ibid.
Counsel for defendant suggests the possibility of an inadvertent error on Walker’s part when he entered on his notes the course and distance northeast from M.C. 70.[4] According to the boundary notes entered on the Walker plat of survey, Walker located the northern boundary line between M.C. 70 and M.C. 71 on a course of North 61°30,/ East for a distance of 4.2 chains (or 277.2 feet). This course and distance took the survey line 90 to 300 feet to the north of the Arroyo Hondo, and defendant’s counsel are loath to believe that Walker would run such a survey line in violation of his instructions as interpreted by them. However, even if Walker did commit error, it is well settled that the courts will not attempt to resurvey the land nor correct possible errors in the surveyor’s work. Davis v. Dilley, 363 P. 2d 658, 660-661 (Colo. 1961); Chandler v. Hibberd, 165 Cal. App. 2d 39, 332 P. 2d 133, 143-144 (1958).
Defendant contends that the Walker survey line which admittedly crossed to the north of the Arroyo Hondo is merely *1026 a meander line thereof and points to the well settled rule that a meander line of a river is not a boundary line because it is normally used to ascertain the quantity of land involved rather than to establish boundaries and because a meander line is run so as to approximate a river, it being impractical to establish survey corners in water or satisfactorily to follow all the sinuosities of a river. See, Thomas B. Bishop Co. v. Santa Barbara County, 96 F. 2d 198, 202 (9th Cir. 1938), cert. den., 305 U.S. 623 (1938); City of Los Angeles v. San Pedro, L.A. & S.L. R. Co., supra, at 450, 454. However, on this record it is doubtful that the Walker survey line of the northern boundary of the Antoine Leroux Grant is, or was, intended to be a meander line of the Arroyo Hondo.
Walker’s instructions as to how to survey the Antoine Leroux Grant specifically direct him to meander the eastern, southern, and western boundaries of the Grant, but make no mention of meandering the northern boundary of the Grant. Under the principle of expressio unius est exclusio cdterius, the omission of a direction to meander the northern boundary of the Grant while specifically directing the meandering of the other boundaries of the Grant must mean that the northern boundary of the Grant was not to be meandered.
Furthermore, Walker’s instructions incorporate by reference the Mcmual of Surveying Instructions of 1902 for the Survey of the Public Lands of the United States and Private Olaims. Under paragraphs 153,157, and 158 of this Manual, it appears clear that a nonnavigable stream such as the Arroyo Hondo shall not be meandered. Accordingly, assuming Walker followed his instructions, his survey line along the Arroyo Hondo is not, and was not intended to be, a meander line.
Walker’s instructions directed him to establish a Northwest and Beginning comer and then to run northeast “along the left or south bank of the Arroyo Hondo” and establish a Northeast corner at “the summit of the main chain or range of the Rocky Mountains.” Thus, it appears that Walker was to go from point (N.W. corner) to point (N.E. corner) in establishing his survey line. The line established by Walker as reflected by his field notes and plat (which are incorporated by reference in the 1911 patent) runs in a fairly straight line *1027 from the Northwest comer of the Grant to the Northeast comer of the grant, parallel to the Arroyo Hondo.
In this connection, it should be noted that when Walker crossed to the north of the Arroyo Hondo at M.C. 70, he may have acted in violation of his instruction to proceed northeasterly “along the left or south bank of the Arroyo Hondo.” This might have been the result of an inadvertence or confusion on his part. Proceeding northeasterly, as he was, the river bank on his left was the north bank, and he may have concluded, especially where the terrain on the south bank was particularly difficult, that his instructions gave him an alternative. If so, he erred. Under the Manual, referred to above, the “left bank” of a river is the bank to the surveyor’s left looking downstream, and Walker was proceeding upstream along the Arroyo Hondo. Thus, the “left bank” of the Arroyo Hondo is the same as the “south bank,” and it was not intended that he have an alternative.
However, even if the surmise of surveyor error is correct, the facts remain that the Walker survey line did ran to the north of Arroyo Hondo in the area here involved, that Walker’s survey was approved by the Surveyor General, and that it and its accompanying field notes were incorporated by reference into the 1911 patent. As such, the survey is binding and conclusive, and the' northern boundary of the Antoine Leroux Grant is the Walker survey line. See, United States v. State Investment Co., supra; Dominguez De Guyer v. Banning, supra; Chandler v. Hibberd, supra; and Velasquez v. Cox, 50 N.M. 338, 176 P.2d 909 (1946).
Based on all the foregoing considerations, I find that enactment by Congress of the bill providing for waiver and relinquishment of any claim of title to the land area in dispute by the United States is appropriate and would not constitute a mere gratuity.
Findings of Fact

Introductory

1. By S. Bes. 277, 91st Cong., 1st Sess., S. 202 entitled, “A bill to provide that the United States disclaims any interest in a certain tract of land,” was referred to the Chief Com *1028 missioner of the United States Court of Claims. The text of S. Res. 277 iis as follows:
Whereas there is pending in the Senate of the United States a bill designated as S. 202, to provide that the United States disclaims any interest in a certain tract of land, as to which the Senate desires the investigation, findings, and conclusions hereinafter referred to:
It is hereby
Resolved, That the said bill, as amended by the Senate Committee on Interior and Insular Affairs, which amendments are shown in the committee print on S. 202, dated October 22, 1969, be referred to the Chief Commissioner of the United State Court of Claims as authorized by section 1492 of title 28 of the United States Code for a report in conformity with section 2509 of title 28 of the United States Code with findings of fact and conclusions sufficient to inform Congress whether the waiver and relinquishment of any claim of title by the United States is appropriate in light of any legal or equitable claim to the real property described therein, or any part thereof, by the private claimants thereto, including findings as to whether the United States by prior legislative and administrative actions has not in fact and in law vested title to the said real property in the claimants or their predecessors in title, and whether, if the private claimants were asserting their claim against any party or entity other than a sovereign, their title would not be deemed good and indefeasible with respect to said Iparty or entity; such report shall not take account of, or be in any way affected by, any conclusions of law or fact hitherto asserted by any administrative agency of the United States with respect to the instant controversy between the claimants and the United States.
2. S. 202, 91st Cong., referred to in S. Res. 277, provides that the United States disclaims any right, title, or interest in 67.68 acres of land near Taos, New Mexico, on the northerly line of the Antoine Leroux Grant. The 67.68 acres referred to in S. 202 was described as an exception to a conveyance of a large part of the Antoine Leroux Grant made by Wrill Ed Harris, et ux. to the United States referred to below. The Antoine Leroux Grant lies generally south of the Rio *1029 Hondo,[1] and the United States does not dispute the rights of plaintiffs to their portion of the land described in S. 202 which lies south of the Rio Hondo but does dispute their right to any land lying north of that stream.

History of the Antoine Leroux Grant

3. On August 9,1742, the Spanish Governor of New Mexico, in the name of the King of Spain, granted 60,084.29 acres (subsequently known as the Antoine Leroux Grant) to three settlers in the vicinity of what is now Taos, New Mexico. The north and south boundaries of the Antoine Leroux Grant were to be 2 leagues apart at all points. The decree of August 9, 1742, described the boundaries of the Grant as follows:
* * * taking for the boundary on the north to the Arroyo Hondo, and two leagues in latitude shall be given him, in the direction of the Del Norte River (Rio Grande) and towards the mountain to its summit.
On May 21, 1857, Antoine Leroux, on behalf of the heirs of the original grantees, filed an application with the United States Surveyor General to confirm their grant from the Spanish Government.
4. The United States Surveyor General investigated the Antoine Leroux Grant claim in October 1861. Thereafter the Surveyor General approved the Grant and recommended to Congress that it be confirmed. On March 3,1869, Congress confirmed the Antoine Leroux Grant as certified by the Surveyor General. At the time of confirmation, the Grant had not been surveyed. However, Congress provided that the commissioner of the general land office “without unreasonable delay” should have the grant surveyed and platted and, upon the filing of such survey and plat, should issue a patent for the lands confirmed. 15 Stat. 342.

*1030
Survey and Issuance of Patent

5. Ia 1877, tbe Antoine Leroux Grant was surveyed by U.S. Deputy Surveyors Sawyer and McElroy, but their survey was rejected. Many years thereafter in 1905, the United States had the Grant surveyed under a contract with John H. Walker, U.S. Deputy Surveyor. Walker’s survey and field notes were adopted and approved by the U.S. Surveyor General on August 25,1909.
6. Walker’s instructions for surveying the Antoine Leroux Grant described the boundaries thereof as follows:
On the north by the Arroyo Hondo,- on the east the summit of the main chain or range of the Rocky Mountains ; on the south by a line extending from the summit of the main chain or range of the Rocky Mountains to the Del Norte River, .established at a distance of two leagues, right angle measurement, from the Arroyo Hondo and parallel to the general course thereof; said line to be run between stations fixed at such points as will make its course conform to every material change in the course of the Arroyo Hondo; on the west by the bed of the Del Norte River.
7. Walker was instructed to establish the northern boundary of the grant as follows:
* * * proceed to the south bank of the Arroyo Hondo, at a point where the said Arroyo Hondo enters the Del Norte River; and after you have fully identified said point at the junction of these two streams, you will establish the' NW and beginning comer of this survey, by setting a proper corner in strict conformity with the Manual of Surveying Instructions of 1902, and marking A Jj the same N.W. & Beg Cor., giving bearings and distances, therefrom, to such natural objects as will permanently identify and fix said corner.
*****
* * * you will run thence in a northeasterly direction along the left or south bank of the Arroyo Hondo to the summit of the main chain or range of the Rocky Mountains, at which point you will establish the N.E. Corner of this survey * * *.
*1031 Walker was instructed to establish the eastern and southern boundaries of the grant as follows:
From the NE corner * * * thence in a southerly direction, meandering the summit of the main chain or range of the Rocky Mountains for a distance of two leagues (5 miles, 16.66% chains) * * * south, right angle measurement of the north boundary and parallel to the several courses thereof. In the .establishment of this south boundary you will run southwesterly from the SE corner previously established by you, on a meander line parallel with the north boundary to an intersection with the Rio Grande del Norte, at which point of intersection on the left or east bank of the Rio Grande del Norte, you will establish the SW comer of this survey * * *
Walker was instructed to establish the western boundary of the grant as follows:
From the SW corner * * * thence northerly meandering the left or east bank of the Rio Grande del Norte, to the NW corner and place of beginning.
8. Between 1909 and 1911, while the issuance of a U.S. patent in connection with the Antoine Leroux Grant was pending, numerous protests of the Walker survey were filed by owners of land adjoining the Grant. The United States Department of Interior reviewed the protests and dismissed them finding that the Walker survey was properly done and represented the true location of the Grant’s boundaries. There is little evidence in the record as to the nature of these protests, other than that some of the protests involved the location of various positions of the boundary lines of the Grant and that some of the protests raised the question of whether the Walker survey followed the main branch of the Rio Hondo or another branch thereof.
9. On August 1, 1911, pursuant to the aforesaid Act of Congress, a patent for the Antoine Leroux Grant, signed by President William H. Taft, was issued by the United States to the heirs and assigns of the original grantees of the Grant, whereby the United States quitclaimed and relinquished any claim of title to the lands contained therein. The patent described the boundaries of the Grant as follows:
On the north by the Arroyo Hondo; on the east by the summit of the main chain or range of the Rocky Moun *1032 tains; on the south by a line extending from the summit of the main chain or range of the Rocky Mountains to the Del Norte River, established at a distance of two leagues, right angle measurement, from the Arroyo Hondo and parallel to the general course thereof, said line to be run between stations fixed at such points as will make its course conform to every material change in the course of the Arroyo Hondo; on the west by the bed of the Del Norte River. * * *
The field notes and a plat of the survey made by Walker were incorporated in the patent by reference, said survey having reduced the area of the original grant from 60,084.29 acres to 56,428.31 acres due to partial overlapping of a prior patent.
10. Theodore Roosevelt, by presidential proclamation, on November 7, 1906, 34 Stat. 3262, withdrew the public land north of the Antoine Leroux Grant in the area in question and established the Taos Forest Reserve. By Executive Order No. 848, June 26,1908, the Taos Forest Reserve was consolidated with other public land in northern New Mexico to form what is now known as the Carson National Forest.

Subsequent Transactions Within the Antoine Leroux Grant

11. By deed dated January 16, 1911, William Fraser and others quitclaimed their interest in a part of the Antoine Leroux Grant. The property involved was described in the deed as an 80-acre tract, beginning 400 feet west of the junction of the Rio Hondo and South Fork, thence easterly along the Rio Hondo 2400 feet, thence southerly 1500 feet, thence westerly 2400 feet, thence northerly to the place of beginning, thereby “meaning to convey eighty acres * * * according to U.S. Government survey.” This 80-acre tract included the area in question.
12. In the 40 years following the issuance of the IJ.S. patent, various conveyances of various parcels within the Antoine Leroux Grant were made. In 1950, the United States Forest Service negotiated an exchange of certain land with Will Ed Harris whereby the United States received most of the land within the Grant in exchange for other land. The Will Harris Deed specifically excepted certain portions of the Grant including 67.68 acres described by references to the *1033 Walker survey. The 80-acre tract which was conveyed by the aforesaid William Fraser deed included these 67.68 acres which, in turn, included the area here in dispute. The northern boundary of the 67.68-acre tract as delineated in the Will Ed Harris deed is identical to the corresponding portion of the survey line run by Walter in 1905 to establish the northern boundary of the Grant.
13. The ownership of the said 80-acre tract, including the aforementioned 67.68-acre tract was acquired by Milton L. Chase through numerous conveyances. One quitclaim deed dated July 15,1950, from Don C. Peterson, Jr. to Milton L. Chase described the property conveyed as follows:
All *_ * * land situated in the Bio Hondo Canon (sic) containing eighty acres, more or less, to wit: beginning at corner No. 1,1400 feet Westerly of the junction of the Bio Hondo and South Fork, thence Easterly along the Bio Hondo 2000 feet; thence Southerly 1400 feet; thence Westerly 2000 feet; thence Northerly 1400 feet to the place of beginning.
A Special Warranty Deed, dated August 27, 1959, from the widow and heirs of J. B. MasterSon to Mr. Chase, described the property conveyed as follows:
Located on the Bio Hondo Stream, at the conflux of the Southfork Stream, * * * boundary of the Antonio (sic) Leroux Grant, and bounded on the South, East, and West by the U.S. Forest property, containing 67.68 acres.
There follows a metes and bounds description which refers to the Walker survey and establishes the northern boundary of the conveyance as identical to a portion of said survey of the northern boundary of the Grant. At the present time the property along the northern boundary of the 67.68-acre tract includes the 6.95 acres here in dispute which are divided among several families, including the plaintiffs herein.
14. By warranty deed, dated January 25,1965, Milton L. Chase et ux. conveyed a tract of land in the disputed area to Patrick Weems Hurley and wife, referring to the Walker survey and the northern boundary of the conveyed tract identically to a portion of the courses and distances of the Walker survey of the Leroux Grant, but specifically excepting *1034 “any portion * * * which lies North of the Rio Hondo.” However, by Correction Quitclaim Deed dated November 25, 1968, the mentioned exception was deleted. That deletion was the only change made in the description of the conveyed property. By warranty deed dated April 27, 1968, a portion of the Chase tract was conveyed by Robert Q. Kennaugh and wife to John F. McGill and wife. The northern boundary of the Kennaugh conveyance was described in identical terms as the courses and distances of a portion of the Walker survey of the Grant but was made “subject to any claim by the United States of America against any property lying north of the Rio Hondo Stream.” In a correction warranty deed dated November 1, 1968, one of the distances in the Kennaugh conveyance was extended 20 feet; no other changes were made in the description of the conveyance. By quitclaim deed dated August 17, 1967, a certain parcel was conveyed to Leon J. Pierce and wife making reference to the Walker survey and describing the northern boundary of the parcel in courses and distances identical to those made by Walker of a portion of the Leroux Grant. By warranty deed dated November 18, 1969, and correction warranty deed dated February 6, 1970, John F. McGill and wife conveyed a portion of the Chase tract to Robert V. Peet and wife. The McGill deeds described the northern boundary of the land conveyed in courses and distances identical to a portion of the Walker survey of the Leroux Grant “SUBJECT TO any claim by the United States of America against any property lying north of the Rio Hondo Stream.” Other conveyances out of the Chase tract were made in which the descriptions of the northern boundary of the land conveyed were also identical to a portion of the Walker survey of the Leroux Grant.

Location of the Walher Survey Line

15. A plat dated January 12, 19,65, of the aforementioned 67.68-acre tract showing the location of the Rio Hondo and the Walker survey line was prepared by Irvin L. Sackett, a registered New Mexico land surveyor operating out of Taos, New Mexico since 1946. In the course of preparing his plat, Mr. Sackett examined the fieldnotes of the Walker survey *1035 and tbe map of the Antoine Leroux Grant prepared by Walker. In addition, Sackett examined and relied on Forest Service files and maps which indicated the location of both the Walker survey line and the Rio Hondo. By following Walker’s map, instructions, and notes, Sackett was able to relocate M.G. (Meander Comer) 70 in the vicinity of the place where the South Fork empties into Rio Hondo. In this relocation, he was aided by his finding the stump of a bearing tree and the foundation of an old copper mill as described by Walker. According to the boundary notes on Walker’s plat of the Antoine Leroux Grant, from M.O. 70, Walker proceeded northeasterly for 277.2 feet (4.2 chains) on a course of N. 61o30' E to reach M.C. 71 and the 13-mile Corner.[2] This course causes the Walker survey Ine to cross the Rio Hondo to its north side. From M.C. 71, the survey line proceeds still north of Rio Hondo, on a course of N. 44°30' E for several thousand feet covering the balance of the 67.68-acre Chase tract.
16. Don B. Ford, who served as Forest Engineer of Carson National Forest from 1956 to 1963, conducted and supervised a survey of the northern boundary of the Chase tract in 1962. Mr. Ford is not a registered surveyor, but has taken some surveying courses and as part of his assigned duties has made surveys on which the U.S. Forest Service relies. He was able to locate the “bearing tree” referred to in the Walker field notes. Ford was able to follow the Walker field notes, but did not set any comers east of M.C. 70 and north of the Rio Hondo because he would not have run a meander line of the river the way the Walker field notes indicated that Walker ran his survey line. Mr. Ford and his crew searched unsuccessfully on each side of the Rio Hondo (north and south), for corners east of point M.C. 70 on the Walker survey line. Although Ford was unable to find any markers of the Walker survey line which would discredit the retracing thereof by Sackett, he concluded that Walker’s course from M.C. 70 was opposite to the way *1036 it was supposed to have been surveyed. Mr. Ford agreed that the Walker survey line could have run as the field notes indicated and as Sackett had retraced the line. While the entire terrain is difficult, on 'balance Ford thought that it would be easier to perforin a survey in the area in question along the north bank rather than along the south bank of the Eio Hondo.
17. The instructions given to Walker as to how to locate boundaries of the Antoine Leroux Grant make no mention of meandering the northern boundary thereof, but the instructions expressly require that the eastern, southern, and western boundaries be meandered. Sackett and Ford both interpreted Mr. Walker’s instructions to mean that the northern boundary of the grant was to be meandered. In Sackett’s opinion, a “meander line” is the same as the “survey line”.
18. The land in dispute is a narrow strip, about 6.95 acres, in an area bounded on the north by that portion of the Walker survey line which lies north of the Rio Hondo and bounded on the south by the Rio Hondo. This strip of land varies in width from 93 feet to 300 feet.

Developments Precipitating this Dispute

19. Early in the summer of 1961, Milton Chase began construction of a cabin on the north side of the Rio Hondo immediately east of the junction of the South Fork and Rio Hondo for Mr. and Mrs. Richard F. Cooke. Harvey Sontag, District Ranger of the U.S. Forest Service for the area in question, observed the construction of this cabin. Sontag was in doubt as to whether the cabin was being constructed on public or private land. He examined the documents pertaining to the aforesaid Will Ed Harris land exchange together with Forest Service maps. These documents and maps seemed to indicate that the cabin was being constructed on private land. In Ms research as to the location of the northern boundary of the Milton Chase tract, however, Mr. Sontag discovered a plat attached to a letter written in 1948 containing a note wMch stated “N. Bdy. Antoine Leroux Grant coincides with S. Bank of Rio Hondo.” Confronted with this inconsistency, Sontag wrote his supervisor for advice as to the true *1037 location of the northern boundary of the Chase tract. Mr. G. R. Proctor, Sontag’s supervisor, in turn, wrote the Regional Forester in Albuquerque, New Mexico, on June 21,1961, seeking advice as to whether the northern boundary of the Chase tract was the Rio Hondo (Arroyo Hondo) or the Walker survey line. On June 26,1961, Proctor was informed by the Assistant Regional Forester as follows:
The descriptions we have are ambiguous. We suggest that you attempt to find the deed of conveyance or court order by which the U.S. got title. If this document reads as the advertisement of the Will Ed Harris exchange, we then suggest that you establish the meander line on the ground. If there is no evidence that the creek might have been along this meander line, or north of it, in 1905 when the Grant was surveyed, we are inclined to believe the cabin is on private land. However, if there is evidence that the stream may have shifted to the south since the survey, you should tell the owner that he should suspend building until the matter can be settled.
If there is to be further consideration, please send any information you have and a map showing the Grant boundary, the stream, cabin site, road and other details which may be helpful in reaching a decision.
20. In May 19.62, the Forest Service contacted the Bureau of Land Management, U.S. Department of the Interior, to determine where the northern boundary line of the Chase tract was located. By memorandum dated June 14,1962, the Bureau of Land Management informed the Forest Service that the northern boundary of the Leroux Grant was the left bank of the Arroyo Hondo rather than the Walker survey line based on the assumption that such line was a proper meander line of the river.
21. Mr. Chase and his wife by warranty deed dated July 28, 1964, conveyed a portion of his land, including the aforementioned cabin to Richard F. Cooke and his wife. This warranty deed gave the Walker survey line as the northern boundary of the property conveyed. This warranty deed contained the following clause:
It is specifically understood that no warranty is made as against any claim made by the United States Government against the property hereinabove conveyed. All *1038 parties acknowledging that the United States Government may and does at the present time claim an interest in and to the above described property.
22. By letter dated July 9,1962, Regional Forester George R. Proctor informed Mr. Cooke that on the basis of the Bureau of Land Management opinion, the northern boundary line of the Antoine Leroux Grant was the Hondo River (Arroyo Hondo). At the insistence of the Forest Service, Mr. and Mrs. Co'oke applied for a special use permit for the cabin on August 28, 1963, and received such permit from the Forest Service on August 29, 1963.
Meanwhile, the Cookes had decided to sell the cabin and surrounding land which they secured from Mr. Chase. For this purpose they employed Mr. Richard B. Grainger, a Taos realtor, who is one of the plaintiffs herein. Subsequently, Mr. Grainger himself decided to buy the cabin and land associated therewith. After Mr. Grainger agreed to buy the cabin, he was informed there was a boundary dispute and was shown a letter dated July 23, 1962, from Fred H. Kennedy, Regional Forester, to Milton Chase which stated:
Our attorney is of the opinion that this survey line must be considered as the property line. Therefore, your property would appear to extend north of the Rio Hondo to the 1909 survey line in the vicinity of Corner No. 71.
Mr. Grainger was informed by George Proctor, the Regional Forester at that time, that the boundary was the Walker survey line even though there was some dispute as to the location thereof. Mrs. Cooke gave Mr. Grainger assurances that the Cookes would get the boundary dispute resolved, but she advised him to get a special use permit from the Forest Service in the meantime. Mr. Grainger did not intend to waive any claim to this property that he might have by obtaining this permit. To his knowledge, the Forest Service had insisted in other areas, where the Walker survey line was south of the Arroyo Hondo, that the Walker survey line, rather than the Arroyo Hondo, was the northern boundary of the Antoine Leroux Grant. He had seen Forest Service boundary signs along the Walker survey line. Being convinced that the Walker survey line was the actual boundary, *1039 Grainger decided to go through with the purchase of the Cooke land to buy it subject to the Government’s claim.
23. Mr. Grainger purchased the Cooke cabin and land together with Mr. Will W. Turbett (also a plaintiff herein) as partner or co-owner. After the purchase, Turbett visited the Forest Service Office in Albuquerque, New Mexico, to discuss the boundary in question. While there he saw a Forest Service Aerial Planimetric Quadrangle map and spoke to the man in charge of the map room who stated, after examining this map, that the cabin and land associated therewith appeared to be private, not public, property. Mr. Turbett had some surveying experience while serving the Army and he made an extensive study of the Walker survey field notes and instructions. He also observed that Forest Service boundary signs were placed on or within 10 feet of the Walker survey line north of the cabin. When he brought the location of the signs to the Forest Service’s attention, the signs were removed. From his investigation, Turbett felt sure that the true northern boundary of the tract in question was the Walker survey line.
24. There are some indications in this record that the course of the Rio Hondo may have changed over the years. Surveyor Sackett testified that rivers in the area in question sometimes do move although in the Hondo River Canyon, he thought the river would not be able to move more tha.n about 50 to 100 feet. Sackett also testified that although the Rio Hondo appears to be in a relatively new bed in the area in dispute, he had no personal knowledge that the river had in fact changed course. At the present time, the cabin in question is situated approximately 15 to 20 feet north of the Rio Hondo. Plaintiff Grainger testified that Milton Chase had moved the Rio Hondo 25 to 30 feet south so as to go around the cabin by dumping mine tailings and using a bulldozer to change the course of the river. Had the location of the river not been changed, it would have flowed through what is now the living room of the cabin. Grainger has himself moved the river slightly south by using a back hoe and putting in fill. Mr. Ford testified that the Forest Service may have moved the Rio Hondo at the South Fork junction in building a bridge and that some changes were made in the *1040 channel above and below the cabin (but not at the cabin) in the course of constructing a road on the north side of the river. Water scars on the trees around the cabin north of the present location of the Rio Hondo indicate that the river at one time may have flowed there.
25. There are many boundary problems where the Carson National Forest joins private lands. Such problems ordinarily do not receive attention from the Forest Service until something like the building of the cabin in question occurs.
26. The plaintiffs were informed by the Forest Service that the United States would not submit to a suit to quiet title to the land in question and that sovereign immunity precluded them from forcing such a suit. Therefore, plaintiffs sought relief from the United States Senate, Committee on Interior and Insular Affairs. A Senate subcommittee, Public Lands, considered plaintiffs’ request for relief. The Senate Subcommittee on Public Lands concluded that a court of law was the proper forum for the resolution of the issues presented. Therefore, the Senate Subcommittee on Public Lands requested the Attorney General of the United States to initiate litigation to resolve such issues. The United States Department of Justice on the basis of a negative recommendation by the United States Department of Agriculture refused to institute litigation to quiet title to the property in question. Thereafter, as stated above, the matter was referred to the Chief Commissioner by S. Res. 277, mfm.

 See United States v. State Investment Co., 285 F. 128 (8th Cir. 1922), aff’d. 264 U.S. 20,6 (1924) ; and see generally 73 C.J.S. Public Lands, §§ 31-32.

 Despite defendant’s contentions, that inquiry is not simply whether a boundary call (as defendant would have it, “On the north by the Arroyo Hondo”) prevails over a conflicting call for courses and distances.

 Also known and referred to as the Rio Hondo or Hondo River. The area involved is near Taos, New Mexico.

 It is known as the Antoine Leroux Grant.

 An earlier survey in 1877 had been rejected by the Surveyor General.

 There seems to be no dispute between the parties that this corner of the walker survey has been relocated accurately, even though the marker Itself has disappeared.

 Rio Hondo is a small mountain stream flowing westward from the main range of the Rocky Mountains in northern New Mexico and emptying into the Rio Grande River. It is also referred to in this record as the “Arroyo Hondo” and the “Hondo River.” It varies in width from 10 to 50 feet and in depth from 4 inches to 10 feet. It appears to be a nonnavigable stream.

 Although Sackett was able to follow the stated course and distance to re-establish M.C. 71, he found no physical evidence of that corner and assumed that Walker’s monument for M.C. 71 had been washed away in the river.